UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LISA BOBBIT,

                Plaintiff,

              -against-

CORRECTIONAL OFFICER MONICA MARZAN;
CORRECTIONAL OFFICER J. CONFORTI;
CORRECTIONAL LIEUTENANT SANDRA HANN;
NEW YORK STATE POLICE TROOPER ROBERT
MURTHA, Shield No. 4235; NEW YORK STATE
POLICE INVESTIGATOR THEODORE DALEY,
Shield No. 3533; NEW YORK STATE TROOPER
SARAH BOLIN; THE STATE OF NEW YORK, THE
NEW YORK STATE POLICE (NYSP), THE NEW
YORK STATE DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISIONS (DOCCS),
JOHN DOES, AND RICHARD ROES,

                Defendants.

LISA BOBBIT,

                Plaintiff,

              -against-

CORRECTIONAL SERGEANT DEAN REBIDEAU;
CORRECTIONAL OFFICER "FNU" [FIRST NAME
UNKNOWN] WONG; CORRECTIONAL OFFICER
"FNU" [FIRST NAME UNKNOWN] HALICKI;
CORRECTIONAL OFFICER NEYSA PALMER;
NEW YORK STATE POLICE ("NYSP") TROOPER
NICOLE WALTHER; NYSP TROOPER KRYSTAL
PAOLICELLI; NYSP INVESTIGATOR KIMBERLY
COMPOS; NYSP TROOPER CHELSEA GAGLIARDI;
JOHN DOES and RICHARD ROES,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/21/2020___

16 Civ. 2042 (AT)

18 Civ. 2465 (AT)

**ORDER**

ANALISA TORRES, District Judge:

      In these consolidated actions, Plaintiff, Lisa Bobbit, brings claims under the Fourth and

Fourteenth Amendments, the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101

*et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and New York state tort law, arising out of the confiscation of her medication and her arrest during a visit to Green Haven Correctional Facility ("Green Haven"), and a pat-frisk, strip search, and subsequent prosecution that ensued.  *See* Marzan Compl., ECF No. 141;[1] Rabideau Compl., No. 18 Civ. 2465, ECF No. 50; Consolidation Order, ECF No. 135; 2017 Order at 53, ECF No 94 (listing remaining claims in case number 16 Civ. 2042); 2018 Order at 21, ECF No. 140 (listing remaining claims in case number 18 Civ. 2465).  Plaintiff asserts claims against the New York State Department of Corrections and Community Supervision ("DOCCS"), the New York State Police (the "NYSP"), the State of New York, Correctional Lieutenant Sandra Hann, Correctional Sergeants John Conforti and Dean Rabideau, Correctional Officers Monica Marzan, Chuen Wong, John Halicki, and Neysa Palmer, NYSP Investigators Theodore Daley and Kimberly Compos, and NYSP Troopers Robert Murtha, Krystal Paolicelli, Sarah Bohlin, Nicole Walther, and Chelsea Gagliardi.  Marzan Compl. ¶¶ 7–10; Rabideau Compl. ¶¶ 6–7; Harben Decl., ECF No. 211.

Now before the Court are Plaintiff's motion for partial summary judgment, ECF No. 208, and Defendants' motion for summary judgment on all claims, ECF No. 209.  For the reasons stated below, the motions are GRANTED in part and DENIED in part.

## BACKGROUND[2]

On March 20, 2015, Plaintiff entered Green Haven, a maximum security prison operated by DOCCS in Dutchess County, to visit an inmate housed there.  Def. 56.1 Stmt. ¶¶ 1–2, ECF No. 212;[3] Def. Mem. at 1, ECF No. 210.  She was carrying with her the medications

---

[1] All citations are to the docket in case number 16 Civ. 2042, except as otherwise noted.
[2] The following facts are drawn from the parties' pleadings and submissions, including the operative complaints, and the parties' Rule 56.1 statements of undisputed fact and the response thereto.  Facts in dispute are so noted.  Citations to a paragraph in Defendants' Rule 56.1 Statement also include Plaintiff's response, and vice versa.
[3] Plaintiff claims that Defendants omitted key facts from their Rule 56.1 statement, and that their motion relies on declarations that were not cited in that statement.  Pl. Opp. at 1–6, ECF No. 128.  Plaintiff argues that the Court should limit its consideration of Defendants' motion to the facts set out in Defendants' statement, and disregard

Lamotrigine, in pill form, and Tramadol, a liquid contained in small vials, as well as a piece of bread.  Def. 56.1 Stmt. ¶¶ 3, 13, 14, 16.  The Tramadol and bread were wrapped together in plastic wrap.  *Id.* ¶ 13.  The parties dispute whether Plaintiff was carrying that package in her pocket or in her sock.  Bobbit Decl. ¶ 13, ECF No. 218; Marzan Dep. Tr. at 62:15–64:6, ECF No. 231-7.  When Plaintiff first entered Green Haven, she interacted with the gate officer and received a visitor's pass, but did not declare that she was carrying any medication.  Def. 56.1 Stmt. ¶¶ 5–6.

Plaintiff passed through a metal detector and walked to another building.  *Id.* ¶¶ 7, 11.  There, Hann asked her to zip up her jacket because her blouse was translucent, and directed Marzan to perform an additional scan.  *Id.* ¶¶ 11–12; Bobbit Decl. ¶¶ 9–11.  Marzan claims that during the scan, she spotted a bulge in Plaintiff's sock, which turned out to be the package with Tramadol and bread.  Marzan Dep. Tr. at 62:15–64:6.  Plaintiff claims that the package was in her pocket, along with the Lamotrigine pills, and that Marzan asked her to remove it.  Bobbit Decl. ¶ 12–13.  Either in the process of removing the package from Plaintiff's clothing or afterwards, one of Plaintiff's Lamotrigine pills fell to the ground.  Def. 56.1 Stmt. ¶ 14; Bobbit Decl. ¶ 21.  Marzan detained Plaintiff and reported the matter to Rabideau, her supervisor.  Def. 56.1 Stmt. ¶ 15; Marzan Dep. Tr. at 67:17–18.  Shortly thereafter, Conforti arrived and took charge of the scene.  Marzan Dep. Tr. at 67:20–68:2.

The NYSP were contacted, and Murtha and Daley traveled to Green Haven.  Def. 56.1 Stmt. ¶ 18.  Marzan prepared a document referred to as a "supporting deposition" that detailed

---

those declarations that were not cited in the statement.  *Id.*  The Court does not agree.  Local Rule 56.1 requires parties to list "the material facts as to which the moving party contends there is no genuine issue to be tried," but it does not provide that a party's failure to include a particular fact in its statement constitutes an admission that the fact is disputed.  The Court has comprehensively reviewed the parties' evidentiary submissions, and it would not promote judicial efficiency or fairness for the Court to ignore undisputed facts established by the record.  Likewise, the Court rejects Plaintiff's argument that it should disregard declarations that Defendants submitted with their moving papers.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

the events, and reported that she had found the package of Tramadol and bread on Plaintiff's ankle (the "Supporting Deposition"). *Id.* ¶ 19; Supporting Deposition, ECF No. 211-9.

Once Murtha and Daley arrived at Green Haven, they arrested Plaintiff. Def. 56.1 Stmt. ¶ 18. Murtha conducted a pat-frisk of Plaintiff, which did not reveal any contraband. *Id.* ¶ 20. She was then taken to the NYSP's "Troop K Headquarters" and processed. *Id.* ¶ 21. While Plaintiff was being held there, she asked to go to the bathroom, and was told by a female NYSP Trooper—which, as will be discussed below, the undisputed evidence shows to be Paolicelli— that she would escort Plaintiff to the bathroom, and that she also had to strip search Plaintiff. Pl. 56.1 Stmt. ¶ 1, ECF No. 208-1. Daley had instructed Paolicelli to "thoroughly" search Plaintiff's body, which he understood to mean a strip search. Daley Dep. Tr. at 73:4–79:20, ECF No. 216-5; Pl. 56.1 Stmt. ¶ 30–31.

Paolicelli walked Plaintiff to the single-user bathroom, and entered with her. *Id.* ¶¶ 6–8. There, Paolicelli conducted a strip search. *Id.* ¶ 10. The parties dispute what the strip search entailed. *Id.* Plaintiff says that Paolicelli made Plaintiff take down her pants, and looked inside of her underwear, made her lift her shirt, pull her bra down and shake the bra, and show her breasts, felt around the band of Plaintiff's bra and felt the skin on Plaintiff's breasts, patted her down with her underwear off, and had her turn around, squat, and open her mouth, while Paolicelli looked at her private areas. *Id.* ¶¶ 10–18. Paolicelli does not remember the incident, but testified that her standard procedure for strip searches is somewhat different:

> I have them start with their shirt. I have them take their shirt off. I have them hand it to me. I go through the shirt, make sure there's nothing there, I put it to the side. And then I go from the top down. We go through the same process; they hand you their bra, I go through the bra, make sure there's nothing in it. I put it to the side. Then, after they are naked, I make them squat, make sure nothing's in the cavities that is visual, and then I ask them to get dressed.

Paolicelli Dep. Tr. at 17:6–16, ECF No. 216-6; Pl. 56.1 Stmt. ¶ 45.  Paolicelli also remained in the room while Plaintiff used the toilet, and looked into the toilet before she flushed.  Pl. 56.1 Stmt. ¶ 19.  This search did not reveal any contraband.

Plaintiff was subsequently released from NYSP custody and issued two desk appearance tickets for violations of New York Penal Law § 205.20 and New York Public Health Law § 3345.  Def. 56.1 Stmt. ¶ 22.  "Under New York law, a police officer can issue a [d]esk [a]ppearance [t]icket to an arrestee rather than holding him or her in custody until a judge is available to conduct an arraignment.  Under this procedure, the arrestee is released and must return to the criminal court at a future date for arraignment."  *Chisolm v. City of New York*, No. 17 Civ. 5327, 2018 WL 3336451, at *1 n.1 (E.D.N.Y. July 6, 2018) (internal quotation marks and citations omitted); *see* N.Y.C.P.L. § 150.10(1).

The case was assigned to Assistant District Attorney Brittney Kessel, who was the Justice Court Prosecutor for the town of Beekman, New York.  Kessel Dep. Tr. at 10:17–11:16, 13:23–14:21, ECF No. 240-2..  Kessel decided to pursue the charges based on her review of police documents and a phone conversation with Daley.  *Id.* at 22:11–16.  After further discussions with Plaintiff's defense attorneys and review of papers provided by them, Kessel offered, and Plaintiff agreed, to an adjournment in contemplation of dismissal (an "ACD"), meaning that the case was kept open for a year on the understanding that, if Plaintiff stayed out of trouble, it would be dismissed without further action.  *Id.* at 22:17–22, 26:22–27:4.  In connection with the charges against her, Plaintiff was required to appear in court in Beekman on at least three occasions. Bobbit Dep. Tr. at 122:12–123:9, 131:5–25, 142:3–12, 154:12–16, ECF No. 216-1.

**DISCUSSION**

I.      Legal Standards

    A.  Summary Judgment

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir. 2004).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Material facts are those which, under governing law, may affect the outcome of a case. *Id.*

The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing particular evidence in the record.  Fed. R. Civ. P. 56(a), (c); *Celotex,* 477 U.S. at 322–25; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002).  The movant may satisfy its burden by "showing that the materials cited do not establish the . . . presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(B).  If the non-moving party has the burden of proof on specific issues, the movant may also satisfy its initial burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact.  *Celotex,* 477 U.S. at 322–23; *PepsiCo Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002).  In deciding the motion, the court views the record in the light most favorable to the nonmoving party.  *O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 61 (2d Cir. 2002).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of fact.  *Beard v. Banks,* 548 U.S. 521, 529 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001).  The opposing party may not avoid summary

judgment by relying solely on conclusory allegations or denials that are unsupported by facts. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir. 2002). Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (internal quotation marks omitted).

### B. Qualified Immunity

"The doctrine of qualified immunity protects government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (internal quotation marks omitted). Thus, to prevail on a constitutional claim for money damages, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (internal quotation marks and citations omitted). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018). The rule must be "settled law," meaning that it "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (internal quotation marks and citation omitted). "In making this determination, [a court must] consider Supreme Court and Second Circuit precedent as it existed at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016).

To be entitled to qualified immunity at the summary judgment stage of a case, a defendant must show that, even viewing the evidence in the light most favorable to the plaintiff, the defendant's actions did not violate clearly established law. *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007).

II.     Fabrication of Evidence

Plaintiff claims that Marzan violated her due process rights, by stating—first to other officers, and then in the Supporting Deposition—that the bag containing Plaintiff's medication and bread was found in her sock, when in reality it was found in Plaintiff's pocket.  Pl. Opp. at 20–24, ECF No. 241.  Plaintiff contends that Marzan's communication of that falsehood to other officers led to her arrest, and that its inclusion in the Supporting Deposition led to her prosecution.  Marzan Compl. ¶¶ 61–63, 78; Def. 56.1 Stmt. ¶ 19; *see* Pl. Opp. at 22.  Plaintiff also claims that Hann, Conforti, and Rabideau are liable as Marzan's supervisors because they approved Plaintiff's arrest, and that Hann, Conforti, Rabideau, Travis, and Wong are liable for failing to intervene to prevent the constitutional violation.  Pl. Opp. at 23.  Defendants move for summary judgment on these claims, arguing that even if Marzan's report that the medication was in Plaintiff's sock were false, Plaintiff has not produced evidence showing that it was the cause of her liberty being deprived.  Def. Mem. at 8–9.  Defendants also argue that all of the officers are entitled to qualified immunity.  *Id.* at 10–11.

A.   Claim Against Marzan

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  To succeed on a claim that fabrication of evidence resulted in the denial of the right to a fair trial, a plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) that [was] likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors,

and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).

The claim that evidence fabricated by Marzan led to Plaintiff's arrest and the claim that it led to her prosecution must be assessed under different standards. When a plaintiff alleges that fabricated evidence caused her arrest, she must show that the arrest was not supported by probable cause absent the falsified evidence, because a showing of probable cause is "the only process due" for an arrest. *Ganek v. Liebowitz*, 874 F.3d 73, 91 (2d Cir. 2017). Moreover, to overcome qualified immunity, a plaintiff must show that the arresting officer lacked even "arguable probable cause to arrest," meaning that under clearly established law, "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004) (internal quotation marks and citations omitted); *see Creese v. City of New York*, 815 F. App'x 586, 586 (2d Cir. 2020) (affirming dismissal of fabricated evidence claim on the basis of qualified immunity where "there was at least arguable probable cause to arrest" plaintiff).

By contrast, when a plaintiff claims that the fabrication of evidence led to "separate harms beyond the deprivation of" liberty caused by an arrest, she can prevail even if her arrest was supported by probable cause. *Ganek*, 874 F.3d at 91; *see also Garnett*, 838 F.3d at 278 ("Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims."). Instead, where plaintiffs allege harms beyond arrest, the question is whether the fabrication of evidence was the *proximate* cause of the deprivation. *See, e.g.*, *Hoyos v. City of New York*, 650 F. App'x 801, 803 (2d Cir. 2016).

Marzan is entitled to qualified immunity on the claim that fabricated evidence caused Plaintiff's arrest. Plaintiff was issued desk appearance tickets charging her with violations of New York Penal Law § 205.20 and New York Public Health Law § 3345. Penal Law § 202.50 provides, in relevant part, that "[a] person is guilty of promoting prison contraband in the second degree when . . . [she] knowingly and unlawfully introduces any contraband into a detention facility." Public Health Law § 3345 states that "[e]xcept for the purpose of current use by the person or animal for whom such substance was prescribed or dispensed, it shall be unlawful for an ultimate user of controlled substances to possess such substance outside of the original container in which it was dispensed." Probable cause to believe that Plaintiff violated either statute is sufficient to defeat a claim arising out of her arrest. *Cf. United States v. Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) ("[T]he Fourth Amendment does not forbid a warrantless arrest for a minor criminal offense, such as a misdemeanor . . . violation punishable only by a fine." (internal quotation marks and citations omitted)). At a minimum, arguable probable cause existed to believe that Plaintiff had violated Public Health Law § 3345 based on the undisputed fact that she was carrying her medication in plastic wrap, rather than its original container. Def. 56.1 Stmt. ¶¶ 3–4, 13–14; *see, e.g.*, *Salvador v. City of New York*, No. 15 Civ. 5164, 2016 WL 2939166, at *6 (S.D.N.Y. May 19, 2016) (finding arguable probable cause for a violation of Public Health Law § 3345 where police found prescribed medication in plastic bag, even where plaintiff explained to officers that the medication was his own and that he intended to take it); *Cortes v. City of New York*, 148 F. Supp. 3d 248, 254 (E.D.N.Y. 2015) (holding a police officer was entitled to qualified immunity for an arrest under Public Health Law § 3345 where arrestee violated the law's literal terms by placing medication into a separate container, and officer

refused to believe arrestee's explanation that he was doing so for momentary convenience); *see also* 2017 Order at 11–15.

However, Marzan is not entitled to summary judgment on Plaintiff's claim that the fabricated evidence caused additional deprivations of liberty in connection with her prosecution. Plaintiff has produced evidence of harms she suffered beyond her initial arrest in connection with being criminally prosecuted.  She testified that she was required to appear in court in Beekman at least three times—in April 2015, June 2015, and a third time on a date she could not recall—and that those trips required significant travel and days off from work.  Bobbit Dep. Tr. at 122:12–123:9, 131:5–25, 142:3–12, 154:12–16.  The Second Circuit has "consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted).  That deprivation is also a cognizable harm for purposes of a fabrication of evidence claim.  *See, e.g.*, *Quiller v. Nunez*, No. 16 Civ. 3202, 2020 WL 4475267, at *10 (S.D.N.Y. Aug. 3, 2020); *Snead v. City of New York*, No. 16 Civ. 9528, 2020 WL 2765844, at *5 (S.D.N.Y. May 28, 2020); *Egan v. New York City*, No. 16 Civ. 1479, 2018 WL 4926445, at *18 (S.D.N.Y. Oct. 10, 2018).

Defendants argue that Plaintiff has failed to produce evidence showing that Marzan's allegedly false report resulted in Plaintiff's being forced to appear in court.  Def. Mem. at 8–9. They point to Kessel's testimony that she would have gone forward with Plaintiff's prosecution regardless of whether the medication was in Plaintiff's sock or in her pocket, because "[i]t's contraband coming into the facility is my position."  Kessel Dep. Tr. at 50:3–15.  But that is not all that Kessel said on the matter.  She also admitted that evidence showing that Plaintiff had the

medication in her sock would tend to show that she was trying to smuggle it into Green Haven, rather than that she merely forgot about it. *Id.* at 34:12–35:4. And she testified that she called Daley to learn more about the fact that the medication was found in Plaintiff's sock prior to proceeding with the case. *Id.* at 33:10–34:11. Indeed, it appears that the presence of the medication in Plaintiff's sock was the only fact that tended to show that Plaintiff "knowingly and unlawfully" brought the contraband into the prison facility, in violation of Penal Law § 202.50. Absent that evidence of *mens rea*, Plaintiff would have been chargeable only with violating Public Health Law § 3345, which is punishable by a $50 fine.

A jury would be entitled to disregard Kessel's conclusion that she would have continued prosecuting Plaintiff even without Marzan's statement that the medication was found in her sock, and focus on the evidence indicating that the location of the medication might have been very relevant to Kessel's charging decision. *See Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012) ("[A] jury is entitled to believe part and disbelieve part of the testimony of any given witness."). Thus, a dispute of material fact exists as to whether Marzan's allegedly false representation in the Supporting Deposition caused Plaintiff to suffer a deprivation of liberty.

Marzan is not entitled to qualified immunity on this claim, because if a jury accepts Plaintiff's version of the facts, Marzan's intentional conduct violated long-established law in this circuit. *See Garnett*, 838 F.3d at 276 ("[F]abrication of evidence violate[s] a clearly established constitutional right" (internal quotation marks and citation omitted)); *Ricciuti*, 124 F.3d at 130 (holding that it is clearly established that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial").[4]

---

[4] In a letter filed after the completion of briefing on the parties' motions for summary judgment, Defendants point to a recent case from the Eastern District of New York holding that, in light of the Supreme Court's opinion in

B.  Claims Against Hann, Conforti, Rabideau, Travis, and Wong

Plaintiff has failed to produce evidence that could establish supervisory liability against

Hann, Conforti, and Rabideau, or liability for a failure to intervene against Hann, Conforti,

Rabideau, Travis, and Wong, related to the fabrication of evidence, because she has not shown

that any of those Defendants was in a position to approve, or intervene to correct, the Supporting

Deposition.  Def. Mem. at 10; Def. Reply at 6–7, ECF No. 247.

To establish supervisory liability for a constitutional tort, a plaintiff must demonstrate

that the defendant supervisor had "personal involvement" in the violation, by showing:

> (1) the defendant participated directly in the alleged constitutional violation, (2)
> the defendant, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of such a
> policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of inmates by failing to act on information
> indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  Plaintiff has not adduced any evidence that

Hann, Conforti, or Rabideau were personally involved in the preparation of the Supporting

Deposition, or its forwarding to the NYSP.  The Supporting Deposition itself is signed only by

Marzan, *see* Supporting Deposition, and was prepared at the request of Daley, Daley Decl. ¶ 4,

ECF No. 214.  Hann, Conforti, and Rabideau have each testified or submitted sworn statements

---

*McDonough v. Smith*, 139 S. Ct. 2149 (2019), a plaintiff bringing a fabrication of evidence claim must show that her criminal case resulted in a favorable termination, and that termination of a case by an ACD does not qualify as a favorable termination.  ECF No. 252; *see Miller v. Terrillion* No. 16 Civ. 52, 436 F. Supp. 3d 598, 606 (E.D.N.Y. 2020).  Defendants waived any argument that Plaintiff's acceptance of an ACD defeats her ability to bring a fabrication of evidence claim in light of *McDonough* by failing to include such an argument in their motion for summary judgment.  In any event, *McDonough*'s holding was limited to the question of when the statute of limitations commences to run on a fabrication of evidence claim.  The Supreme Court expressly refrained from addressing "the Second Circuit's articulations of the [fair trial] right at issue and its contours," 139 S. Ct. at 2155.  This Court remains bound by the Second Circuit's precedent that a plaintiff suffers an actionable injury when fabricated evidence affects, for example, "the setting of bail, which may make the difference between freedom and confinement pending trial," or "the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action," issues which have nothing to do with the ultimate resolution of the criminal case.  *Garnett*, 838 F.3d at 277.

indicating that they had not reviewed it.  *See* Hann Decl. ¶¶ 23, 28, ECF No. 215; Conforti Decl. ¶ 7, ECF No. 217; Rabideau Dep. Tr. at 67:9–13, ECF No. 240-3.  Plaintiff has not submitted any evidence that shows that Hann, Conforti, or Rabideau was aware of the contents of the Supporting Deposition, or approved it before it was sent to the NYSP.[5]  Plaintiff asserts, without evidentiary support, that Hann, Conforti, and Rabideau "were in a position to be directly aware that Marzan would be lodging a false allegation against Plaintiff that the bread and medication were in her sock rather than her pocket."  Pl. Opp. at 24.  But the Court may not assume that Hann, Conforti, and Rabideau were personally involved in the alleged fabrication of evidence against Plaintiff merely because of their supervisory role, without any evidence showing what steps they took, or did not take, in connection with the creation and forwarding of the allegedly untruthful document.

An officer is liable for failing to intervene to prevent a constitutional violation if "that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official," and the officer had "a realistic opportunity to intervene to prevent the harm from occurring."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  Again, Plaintiff has produced no evidence that shows that Hann, Conforti, Rabideau, Travis, or Wong knew of the contents of the Supporting Deposition, had a chance to affect its contents or prevent its forwarding, or had the opportunity to correct any misconception it caused.

Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claim that evidence fabricated by Marzan caused her arrest and associated deprivations of liberty,

---

[5] Plaintiff's argument that the Court "has already decided the issues concerning Plaintiff's claims against [Hann and Conforti] for failure to intervene and supervisory liability in connection with Marzan's fabrication of evidence" is misconceived.  Pl. Opp. at 23.  In an order issued on September 28, 2017, the Court held that Plaintiff's supervisory liability claims against Hann and Conforti could survive a motion to dismiss because Plaintiff alleged "that Hann and Conforti approved Plaintiff's arrest."  2017 Order at 29.  At the summary judgment stage, however, Plaintiff's obligation is to come forward with evidence that shows those Defendants' personal involvement in the constitutional violation.  She has not done so.

and as to Plaintiff's supervisory liability claims against Hann, Conforti, and Rabideau, and

failure to intervene claims against Hann, Conforti, Rabideau, Travis, and Wong.  Defendants'

motion is DENIED as to Plaintiff's claim that Marzan's fabrication of evidence caused Plaintiff

to suffer a deprivation of liberty in connection with her prosecution.

III.   <u>Pat-Frisk</u>

Plaintiff claims that Murtha violated her constitutional rights by excessively "palpating"

her breasts while frisking her, and that his doing so constituted assault and battery under New

York law.  Pl. Opp. at 25–26; Marzan Compl. ¶¶ 96–98.  She also claims that Daley, Hann, and

Conforti were present for the frisk, and failed to intervene.  Pl. Opp. at 26.  Defendants seek

summary judgment on those claims.  Def. Mem. at 11–14.

A.  Claims Against Murtha

"A search or seizure supported by probable cause may be unreasonable in violation of the

Fourth Amendment if it is conducted in an extraordinary manner, unusually harmful to an

individual's privacy or even physical interests—such as, for example, seizure by means of

deadly force, unannounced entry into a home, entry into a home without a warrant, or physical

penetration of the body."  *United States v. Wilson*, 699 F.3d 235, 243 (2d Cir. 2012) (internal

quotation marks and citation omitted).  "A pat-frisk can become unreasonable, and therefore

violate the Fourth Amendment, based on the way in which it is conducted."  *Webb v. Foreman*,

No. 93 Civ. 8579, 1997 WL 379707, at *4 (S.D.N.Y. July 9, 1997).  Excessive and deliberate

contact with sexualized parts of a subject's body during a frisk—in other words, groping—

violates the Fourth Amendment.  *See, e.g.*, *Scalpi v. Amorim*, No. 14 Civ. 2126, 2018 WL

1606002, at *18–19 (S.D.N.Y. Mar. 29, 2018); *Wright v. City of Waterbury*, No. 3:07 Civ. 306,

2011 WL 1106217, at *7 (D. Conn. Mar. 23, 2011); *Garcia v. New York State Police Investigator Aguiar*, 138 F. Supp. 2d 298, 303–04 (N.D.N.Y. 2001).

Plaintiff and Defendants give flatly contradictory accounts regarding Murtha's frisk of Plaintiff.  Def. 56.1 Stmt. ¶ 20.  Murtha testified that, following the standard procedure for a pat-frisk, he frisked Plaintiff's chest area using the side and back of his hand, and did not squeeze or palpate her breasts.  Murtha Dep. Tr. at 80:20–84:24, ECF No. 246-10; Murtha Decl. ¶¶ 8–11, ECF No. 237.  But Bobbit represents that Murtha "placed his hand on both of my breasts," and "palpated my breasts in a sexual manner, that was not designed to search for anything, but instead was done for his own sexual pleasure."  Bobbit Decl. ¶¶ 40–41; *see* Bobbit Dep. Tr. at 93:19–23 ("The trooper began to search me, and as he was searching me, the way that he groped my breasts was very inappropriate.").

Viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in her favor, her testimony that Murtha "palpated" and "groped" her breasts, and her characterization of his actions as sexual, could show that Murtha's frisk deliberately exceeded the bounds of what was reasonably necessary to check Plaintiff for weapons or contraband.  *See Carpenter v. City of New York*, 984 F. Supp. 2d 255, 267 (S.D.N.Y. 2013) ("[Plaintiff] complains that [an officer] gratuitously grabbed her breasts during the arrest . . . .  Although these allegations are disputed, they raise issues of fact which may only be resolved by a jury.); *cf. Scalpi*, 2018 WL 1606002, at *19 (granting summary judgment where "[p]laintiff [did] *not* contend that defendant grabbed or squeezed [p]laintiff's breasts or genital area" (emphasis added)); *Wright*, 2011 WL 1106217, at *7 (granting summary judgment where defendant "did *not* grab [the plaintiff's] groin area or touch underneath his clothing, and the search of [his] groin

area was extremely quick" (emphasis added)).  Because the fundamental facts of Plaintiff's claim

remain in dispute, Murtha is not entitled to summary judgment.[6]

Murtha is also not entitled to qualified immunity on this claim, because if Plaintiff's

account is true, his conduct violated clearly established law.  It is clearly established that "a

search must be 'reasonably related in scope to the circumstances which justified the interference

in the first place.'"  *United States v. Casado*, 303 F.3d 440, 447 (2d Cir. 2002) (quoting *Terry v.

Ohio*, 392 U.S. 1, 20 (1968)).  No reasonable officer could believe that fondling an arrestee's

breasts was a reasonable part of a search incident to arrest.  *See Brown v. City of Utica*, No. 617

Civ. 1190, 2020 WL 1046022, at *7 (N.D.N.Y. Mar. 4, 2020); *Fontana v. Haskin*, 262 F.3d 871,

882 n.8 (9th Cir. 2001) (noting that sexual misconduct by an officer during an arrest "if proved,

is *malum in se*.  No reasonable officer could believe this conduct did not violate [the arrestee's]

constitutional rights."); *see also Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) (holding,

under the Eighth Amendment right to be free from cruel and unusual punishment, that a prison

guard "violated [an inmate's] rights when he allegedly squeezed and fondled [the inmate's] penis

and roamed his hands down [his] thigh," because "[i]n the circumstances alleged, the extensive

search of [his] genitalia was not incident to any legitimate duties" (internal quotation marks

omitted)).  Of course, if Murtha's conduct was not as intrusive or as deliberate as Plaintiff

describes, then it might fall into the "gray area[]" where qualified immunity operates.  *Figueroa

v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016).  But for now, "there remains a genuine factual dispute"

on that issue, and "the existence of qualified immunity cannot be determined until the factual

---

[6] Defendants seek summary judgment on Plaintiff's state law assault and battery claims fail for the same reasons as on her constitutional claim.  Because Plaintiff's evidence is enough to show that Murtha made intentional wrongful physical contact with her, Plaintiff's state law claims survive summary judgment.  *See Meyers v. Epstein*, 232 F. Supp. 2d 192, 196 (S.D.N.Y. 2002).

dispute is resolved." *Franco v. Gunsalus*, No. 19-0891, 2020 WL 5079261, at *3 (2d Cir. Aug. 28, 2020).

### B. Claims Against Daley, Hann, and Conforti

Plaintiff claims that Daley, Hann, and Conforti were in the room when Murtha conducted the frisk. Bobbit Decl. ¶¶ 38–40; Bobbit Dep. Tr. at 93:11–25. But she has produced no evidence that any of those officers were in a position to observe Murtha conducting the allegedly sexualized frisk, or that they would have had a reasonable opportunity to intervene to prevent it. Hann asserts that she did not see Murtha conduct the frisk at all, Hann Decl. ¶¶ 32–33, and Daley does not remember the incident, Daley Decl. ¶ 15. Conforti admits that he did witness Murtha's frisk, but avers that he observed a "normal pat[-]frisk" that "did not appear sexual in nature." Conforti Decl. ¶ 11; *see also* Conforti Dep. Tr. at 57:7–58:10, ECF No. 231-19. Plaintiff has not produced any evidence that could show that the frisk was conducted in such a manner as to make its sexualized nature obvious to Conforti, or anyone else in the room, much less that Daley, Hann, or Conforti had a meaningful opportunity to intervene before the frisk was over.

Accordingly, Defendants' motion for summary judgment is DENIED as to Plaintiff's claim against Murtha, but GRANTED as to Plaintiff's claims against Daley, Hann, and Conforti.

### IV. Strip Search

Plaintiff claims that Paolicelli violated her rights under the Fourth Amendment by conducting a strip search and visual body cavity search, and that Daley likewise did so by directing Paolicelli to conduct the search. Pl. Mem. at 9–15, ECF No. 220. Plaintiff also claims that if Paolicelli did not conduct the search, then one of Gagliardi, Campos, Walther, or Bohlin did. Pl. Opp. at 27. And she claims that Marzan can be held liable for the search as well, because her alleged misrepresentation that Plaintiff's medication was found in her sock caused

the search to occur.  *Id.* at 30.  Both parties seek summary judgment on these claims.  *Id.*; Def.

Mem. at 14–18.

The Second Circuit has defined three categories of intrusive searches of an arrestee's

person:

> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a
> "visual body cavity search" is one in which the police observe the suspect's body
> cavities without touching them (as by having the suspect to bend over, or squat
> and cough, while naked); (3) a "manual body cavity search" occurs when the
> police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citing *People v. Hall*, 886

N.E.2d 162 (N.Y. 2008)).

"The Fourth Amendment requires an individualized reasonable suspicion that a

misdemeanor arrestee is concealing weapons or other contraband based on the crime charged, the

particular characteristics of the arrestee, and/or the circumstances of the arrest before she may be

lawfully subjected to a strip search."  *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (internal

quotation marks, citations, and alteration omitted).  "To establish reasonable suspicion, officers

must point to specific objective facts and rational inferences that they are entitled to draw from

those facts in light of their experience.  The standard requires individualized suspicion,

specifically directed to the person who is targeted for the strip search."  *Id.* (internal quotation

marks, citation, and alterations omitted).  In short, "the relevant question is . . . [d]o the

circumstances of [the plaintiff's] arrest support a reasonable suspicion that she was secreting

contraband on her person?"  *Id.* at 101.  Likewise, "visual body cavity searches must be justified

by specific, articulable facts supporting reasonable suspicion that an arrestee is secreting

contraband inside the body cavity to be searched."  *Sloley v. VanBramer*, 945 F.3d 30, 33 (2d

Cir. 2019).  "Moreover, when the Fourth Amendment requires an officer to have reasonable

suspicion before undertaking a search, an officer is entitled to qualified immunity unless [a

court] can say on the somewhat unique facts before [it] that it is clearly established that no

reasonable suspicion justified a visual body cavity search" or strip search.  *Id.* at 43 (internal

quotation marks and citation omitted).

> A.  Personal Involvement

Plaintiff argues that there is no factual dispute that Paolicelli conducted a strip search and

visual cavity search of Plaintiff, at Daley's order.  Pl. Mem. at 9–14.  Paolicelli matches

Plaintiff's physical description of the trooper who searched her, and Plaintiff selected Paolicelli

from a photo array of NYSP troopers who could have conducted the search.  Pl. 56.1 Stmt. ¶¶ 3–

5; Bobbit Decl. ¶¶ 46–51; Bobbit Dep. Tr. at 105:7–106:8.  Defendants do not concede that

Paolicelli conducted the search or that Daley ordered it, but they admit that it is possible.  Def.

Opp. at 8–9, ECF No. 242.  Neither Paolicelli nor Daley recall whether they did so, although

Daley states that it is "likely" that he would have ordered a more thorough body search under the

circumstances.  Daley Dep. Tr. at 73:4–74:9.   "[L]ack of memory does not create a genuine

issue of fact," *Edwards v. Macy's Inc.*, No. 14 Civ. 8616, 2015 WL 4104718, at *6 (S.D.N.Y.

June 30, 2015) (citing *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75

(2d Cir. 2000)), and Defendants have not put forward any other evidence suggesting that

Paolicelli or Daley were not involved in the search.  Accordingly, Plaintiff is entitled to summary

judgment on the questions of whether Paolicelli conducted the search at issue and whether Daley

ordered it.

On the other hand, Defendants move for summary judgment on Plaintiff's claims against

Gagliardi, Campos, Walther, and Bohlin.  Def. Mem. at 14–15.  Plaintiff continues to pursue

claims against those officers, arguing that although she believes Paolicelli conducted the strip

search, "[i]f a jury, *arguendo,* were to determine that Plaintiff cannot establish sufficiently that it was Paolicelli who strip searched her, they could in the alternative award liability jointly and severally against all of Paolicelli, Gagliardi, Campos, Walther, and Bohlin, who are all the female [NYSP] personnel who opposing counsel selected as possibly being in a position to have conducted the strip search."  Pl. Opp. at 27.  Plaintiff may not proceed to trial against five officers on the theory that one of them must be liable.  Rather, to defeat Defendants' motion for summary judgment, she must produce evidence that shows that each Defendant, individually, was personally involved in the alleged unconstitutional action.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this [c]ircuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks and citation omitted)).  She has produced no such evidence as to Gagliardi, Campos, Walther, or Bohlin.  To the contrary, she avers that of the photographs shown to her in the photo array "only [Paolicelli] looked like she could have been the female trooper who strip searched me."  Bobbit Decl. ¶ 50.

There is also no merit to Plaintiff's contention that she can assert a claim against Marzan, on the theory that Marzan's alleged misrepresentation that Plaintiff's medication was in her sock caused the NYSP officers to conduct a strip search.  Pl. Opp. at 30.  Even if a jury were to find that Marzan fabricated that information, Plaintiff has not produced evidence showing that the location of the medication in her sock was the proximate cause of Daley or Paolicelli's decision to conduct a strip search.  *See Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998) ("[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."); *Luna v. City of New York*, 18 Civ. 4636, 2019 U.S. Dist. LEXIS 135376, at *24 (S.D.N.Y. Aug. 9, 2019) ("Discovery is needed to test [the plaintiff's] claim

that . . . defendants falsely accused him and, if so, which defendants and whether that accusation was a proximate cause of the ensuing strip search.").  To the contrary, the undisputed evidence suggests that Daley would have directed a search of her body regardless of where the medication was located.  *See* Daley Dep. Tr. at 71:17–25 ("[Plaintiff], at the time of the investigation, was believed to have brought contraband, potentially a scheduled narcotic, into Green Haven, was the premise of the investigation and the arrest.  That would have warranted a search of her person to see if there was anything else of that nature secreted upon her.").

Accordingly, Plaintiff's claims may proceed only against Paolicelli and Daley.

B.  Reasonable Suspicion

Plaintiff argues that the uncontroverted evidence shows that Paolicelli and Daley could not have had reasonable suspicion justifying a strip search or visual cavity search.  Pl. Mem. at 11–15.  In return, Defendants argue that under the undisputed facts, Paolicelli and Daley did have reasonable suspicion to conduct the search of Plaintiff's body—or, at a minimum, that such a search was not prohibited by clearly established law.  Def. Mem. at 15–18.

Reasonable suspicion must be assessed "in light of the totality of the circumstances known to the officers at the time the search was begun."  *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007).  At the time that Daley directed Paolicelli to conduct a thorough search for contraband on Plaintiff's body, the undisputed evidence shows that he had the following information:  (1) Plaintiff had been stopped at Green Haven with pills, vials of an unknown liquid substance, and bread, together in plastic wrap, Daley Decl. ¶ 3; (2) those items were discovered on Plaintiff's person after she had gone through security, and after she had been selected for a supplemental scan, *id.*; (3) the package had been discovered in Plaintiff's sock, *id.*; (4) an additional pill fell from Plaintiff's shirt after the other medication was found, *id.* ¶ 5; (5)

22

Plaintiff identified the pills and liquid as medication she intended to take, and the bread as food she needed to eat with the medication, *id.* ¶ 9; (6) Plaintiff stated that she intended to bring the medication and bread into the facility with her to consume during her visit, *id.*; and (7) Plaintiff had already been frisked at least once, and that frisk had not turned up any additional contraband, Bobbit Decl. ¶¶ 38–40; Bobbit Dep. Tr. at 93:11–25; *see also* Daley Decl. ¶¶ 15–16 (representing that Daley has no memory of whether he observed Plaintiff being frisked).[7]  Daley states that he "would have explained the reasons for the search to the female NYSP employee being assigned the task"—i.e., to Paolicelli—"including the information regarding the incident relayed by Officer Marzan."  Daley Decl. ¶ 23.

Those facts do not give rise to reasonable suspicion that would justify the intrusive search performed on Plaintiff, whether that search took place as described by Plaintiff or in accordance with Paolicelli's usual practice.[8]  Even ignoring Plaintiff's explanation for why she had the medication and focusing on the most inculpatory details, Daley and Paolicelli knew that Plaintiff had been stopped trying to enter Green Haven with several pills and vials of liquid, which were apparently drugs of some sort, and a piece of bread, in her sock.  It is not reasonable to infer from the discovery of contraband in Plaintiff's sock that she was also concealing contraband on her body in locations where it could only be accessed by requiring her to fully disrobe, squat to expose her private parts, and use the bathroom, all in view of an officer.  If anything, the natural inference is the reverse:  a smuggler would not risk concealing a bulky package in her sock if she

---

[7] Defendants argue that an additional pill was discovered in Plaintiff 's possession at the NYSP barracks.  Def. Mem. at 18.  Plaintiff admits this, but says that she voluntarily disclosed it to an officer when she realized she still had it.  Pl. Opp. at 31.  Regardless, there is no evidence that Daley or Paolicelli were aware of this additional pill at the time of the strip search.

[8] Defendants argue that the operative complaint claims only that Daley and Paolicelli conducted a "strip search," and not a "visual cavity search," and so the Court should apply a less rigorous standard.  Def. Reply at 12–14.  But regardless of the label that is placed on a given search, the fundamental Fourth Amendment standard is the same:  do the facts known to the searching officer give rise to a reasonable suspicion that the search will uncover a weapon or evidence of a crime?

also was willing to secrete contraband in more sensitive parts of her body.  There is no evidence that Plaintiff engaged in any conduct indicating that she had additional drugs hidden in any specific areas of her person.  No witness has testified, for example, that Plaintiff "was fidgeting or moved about suspiciously," "that [s]he reached or attempted to reach [her] hands down [her] pants," "that anyone observed [her] putting drugs down [her] pants or retrieving drugs (or anything else) from inside [her] pants," or "that [Plaintiff] was previously known to secrete drugs inside [her] anal cavity" or vagina, or around her breasts.  *Sloley*, 945 F.3d at 46 (citations omitted).  Moreover, Murtha's pat-down search of Plaintiff's body did not reveal any contraband or raise any further suspicions.  *See Hartline*, 546 F.3d at 101.

Daley assets that in his experience, behavior like Plaintiff's is consistent with an effort to hide drugs.  Daley Decl. ¶ 21.  That may be so, but Defendants have put forward no evidence that Plaintiff's actions could be taken to indicate that she was hiding drugs in a location that could only be revealed by examining her naked body, and requiring her to squat and relieve herself in front of an officer.  Because the undisputed evidence, viewed in the light most favorable to Daley and Paolicelli, demonstrates that they lacked reasonable suspicion justifying that search, the Court concludes that their actions violated the Fourth Amendment.

Further, Daley and Paolicelli are not entitled to qualified immunity.  The Second Circuit has held that as early as 2013, "every reasonable officer in the [Defendants'] position as New York State Troopers would have known that visual body cavity searches conducted incident to any arrest must additionally be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity."  *Sloley*, 945 F.3d at 40.  Thus, the circuit court has denied qualified immunity to officers who conducted searches "in the absence of indicia that [the Second Circuit] or New York State courts have

found to support individualized reasonable suspicion." *Id.* at 46 (internal quotation marks and citation omitted); *see also Sanchez v. Bonacci*, 799 F. App'x 60, 62 (2d Cir. 2020) (holding that body cavity search conducted without reasonable suspicion violated clearly established law).

Accordingly, Plaintiff's motion for summary judgment on her Fourth Amendment claim against Daley and Paolicelli is GRANTED, and her motion is otherwise DENIED.  Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims against Gagliardi, Campos, Walther, Bohlin, and Marzan, but DENIED as to her claim against Daley and Paolicelli.

V.      ADA and Rehabilitation Act

Plaintiff seeks relief against DOCCS and the NYSP,[9] and Hann, Conforti, Marzan, Daley, and Paolicelli, under the ADA and the Rehabilitation Act, on the theory that she was denied a reasonable accommodation after she explained to them that the pills and liquid she had carried into Green Haven were needed seizure medication.  Pl. Mem. at 16–17; 2017 Order at 37.  Both parties move for summary judgment on this claim.  Pl. Mem. at 16–17; Def. Mem. at 19–25.

A.  Legal Standards

Because the standards provided by § 504 of the Rehabilitation Act and Title II of the ADA are nearly identical, courts consider claims under the two statutes together.  *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).  To establish a claim, "a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to one of the [a]cts; and (3) he was denied the opportunity to participate in or benefit from the

---

[9] In an earlier order, the Court dismissed Plaintiff's Rehabilitation Act claim against the NYSP on the ground that Plaintiff had failed to allege that any NYSP officers were aware of her epilepsy or need to take medication.  2018 Order at 7–8.  Plaintiff argues that the Court should reinstate her claims against the NYSP because she has produced evidence showing that Daley and Paolicelli were given that information by Plaintiff.  Pl. Mem. at 16; *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").  The Court need not decide whether Plaintiff should be permitted to revive her claim against the NYSP; even if she were, the claims would fail for the reasons described below.

defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196–97 (2d Cir. 2014) (internal quotation marks and citation omitted).

To demonstrate that she has a disability, a plaintiff "must first show that she suffers from a physical or mental impairment," then "identify the activity claimed to be impaired and establish that it constitutes a major life activity," and finally "show that her impairment substantially limits the major life activity previously identified." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (internal quotation marks and citations omitted). The entities subject to the requirements of Title II of the ADA include "any State or local government," and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. §§ 12131(1), 12132, and an entity is subject to § 504 of the Rehabilitation Act if it receives federal financial assistance, 29 U.S.C. § 794(a). To establish discrimination, a plaintiff may show that she was subject to disparate treatment on the basis of her disability, that defendants' actions had a disparate impact on her as a result of her disability, or that defendants failed to make a reasonable accommodation of her disability. *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016).

In addition, claims for money damages against state agencies (or state employees in their official capacity) are barred by the state's sovereign immunity, unless the state has waived its immunity to suit or Congress has exercised its constitutional authority to abrogate the state's immunity. *See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 193 (2d Cir. 2015). Title II of the ADA abrogates state sovereign immunity, but only to the extent that violations of the ADA are also violations of the Fourteenth Amendment, or fall within Congress's power to take preventive measures to prevent constitutional violations. *Id.* at 194.

Accordingly, when confronted with claims under Title II, a court must "determine, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)).  At a minimum, covered claims include those where the plaintiff makes "a showing of discriminatory animus or ill will," because in those cases discrimination in contravention of the ADA also threatens the rights protected by the Equal Protection Clause.  *Id.*

### B.  Official Capacity Claims

Defendants argue that Plaintiff improperly seeks relief against Hann, Conforti, Marzan, Daley, and Paolicelli, and neither the ADA nor the Rehabilitation Act permit claims against individuals.  Def. Opp. at 18.  Courts in this circuit are divided on the question of whether either statute permits suits against government officers in their official capacity.  *See Holly v. Cunningham*, No. 15 Civ. 284, 2016 WL 8711593, at *4 (S.D.N.Y. June 17, 2016) (collecting cases).  But in this case, the point is irrelevant.  Those courts that have allowed official-capacity damages actions under the ADA have done so on the ground that "an individual sued . . . in his or her official capacity is effectively a public entity subject to liability under the ADA because the government is the real party in interest in an official capacity suit, *id.* (internal quotation marks and citation omitted), and thus any judgment would be paid from the state treasury.  *See, e.g.*, *Waters v. Bloomberg*, No. 3:19 Civ. 00812, 2019 WL 2343669, at *3 n.3 (D. Conn. June 3, 2019) ("If a . . . suit against a state official in his or her *official* capacity seeks *money damages*,

the state is deemed to be the real party in interest because an award of damages would be paid from the state treasury." (emphasis in original)).

Plaintiff asserts claims against DOCCS and the NYSP.  Marzan Compl. ¶¶ 88–95.  It makes no practical difference, therefore, whether she can independently pursue official-capacity claims against Hann, Conforti, and Marzan as officers of DOCCS and Daley and Paolicelli as officers of the NYSP, or whether she can only pursue claims against DOCCS and the NYSP for the actions taken by Hann, Conforti, Marzan, Daley and Paolicelli.  The applicable legal standards are the same, and any possible judgment would run against the state regardless.  To avoid confusion, the Court will collectively refer to the claim against DOCCS and the possible official-capacity claims against Hann, Conforti, Marzan simply as the claim against DOCCS, and likewise will refer to the claim against the NYSP and the claims against Daley and Paolicelli together as the claim against the NYSP.

### C.  Claim Against DOCCS

DOCCS is subject to the ADA and the Rehabilitation Act.  *See Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016).  However, Defendants argue that Plaintiff has not shown that (1) she has a disability, Def. Mem. at 19–21, (2) DOCCS failed to reasonably accommodate that disability, *id.* at 21, 23–24, (3) she was injured as a result of the alleged failure to accommodate her, *id.* at 24–25, or (4) any failure to accommodate her was undertaken with discriminatory animus, *id.* at 22.  *See also* Def. Opp. at 18–25.  The Court concludes that there are material disputes of fact on each of those issues.

#### 1.  Disability

Plaintiff suffers from a number of ailments, including epilepsy, which she treats with the Lamotrigine pills she was carrying at Green Haven, and severe sciatic pain, which she treats with

the Tramadol she was carrying.  Bobbit Decl. ¶¶ 4, 13.  Defendants argue that Plaintiff has failed

to show that these conditions or others limit her ability to participate in any major life activity,

noting that Plaintiff is a self-employed caterer who has worked large events, that she previously

worked full-time at New York Presbyterian Hospital, and that she attends school.  Def  Mem. at

20; Bobbit Dep. Tr. at 15:12–18:4, 20:8–21.  Plaintiff testified, however, that she had to take a

leave of absence and ultimately resign from her hospital job because of her seizures.  Pl. Opp. at

34; Bobbit Dep. Tr. at 18:5–19:12.  Drawing all inferences in Plaintiff's favor, a jury could find

that her inability to continue working at New York Presbyterian as a result of her disability

indicates a broader limitation on her ability to work—a major life activity.  On the other hand, a

jury could take Plaintiff's apparent ability to work successfully as a caterer as proof that her

epilepsy limits her only from a narrow range of jobs.  *See Freeman v. Kirisits*, No. 18-3218,

2020 WL 3096330, at *3 (2d Cir. June 11, 2020) ("To be substantially limited in the major life

activity of working[,] one must be precluded from more than one type of job, a specialized job,

or a particular job of choice." (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 492 (1999)

(alteration omitted))).

## 2.   Accommodation

Defendants claim that DOCCS's policy with regard to needed medication is a reasonable

accommodation of disabilities like Plaintiff's.  Def. Mem. at 23–24.  That policy provides,

"Visitors having medication in their possession shall declare it and relinquish it to the gate

officer.  1. Medication shall be identified and stored in a secure area.  2. If a visitor needs the

medication during the visiting period, it may be obtained as directed by the facility."  ECF No.

231-4 at 5; *see also* ECF No. 231-5 at 17 (DOCCS Handbook for the Families and Friends of

New York State DOCCS Offenders, stating, "All medications must be declared and given to the

processing officer.  They shall be identified and stored in a secure area.  If the visitor needs the medication during the visiting period, it may be obtained as directed by security staff.").  Defendants argue that DOCCS was not required to make any additional accommodation for a person who failed to comply with this policy.  Def Mem. at 23–24.  But, as Plaintiff points out, DOCCS's policy specifically contemplates that prison visitors may inadvertently bring medication through security, and gives officers discretion in how to respond.  The policy states:

> When undeclared contraband is found, the visitor's intent shall be controlling.  At times, innocent oversights will occur (e.g. medication).  Officers should use their discretion in judging whether the visitor intentionally attempted to introduce contraband into the facility.  Criteria to be considered include past history, the visitor's demeanor, whether it appears that the contraband was for the visitor's personal use and was inadvertently left in a pocket or handbag, and whether an effort was made to conceal the contraband where it would not readily be found.

ECF No. 231-5 at 6.  The question, then, is whether DOCCS reasonably applied that policy—in other words, whether they denied Plaintiff a reasonable accommodation by treating Plaintiff as if she had brought the medication through security intentionally, and consequently confiscating the medication and detaining her, rather than allowing her to return to the front gate to store the medication in a secure area, or to ingest it.

Plaintiff claims that she told Marzan, Hann, and Conforti that the pills and liquid she was carrying were medication that she had meant to take, tried to show them her medical wristband, implored them that seizures could be very serious, and asked if she could take the medication.  Pl. 56.1 ¶ 28; Bobbit Decl. ¶¶ 13–15, 22–24, 37; Bobbit Dep. Tr. at 63:23–64:4, 70:9–16, 80:25–81:8, 153:3–17.  Defendants deny that Plaintiff made those statements, except that Hann admits that Plaintiff said the pills were her seizure medication.  Pl. 56.1 ¶ 28; Marzan Dep. Tr. at 143:5–12; Conforti Dep. Tr. at 50:23–52:3; Hann Dep. Tr. at 96:4–13, ECF No. 231-11.  Plaintiff also claims that Conforti said to her, "I know you didn't mean to bring the medication in here,"

Bobbit Dep. Tr. at 81:6–7, while Conforti denies any such conversation, Conforti Dep. Tr. at 51:11–52:3.  And, of course, Plaintiff claims that she had the Tramadol in her pocket, while Defendants claim it was in her sock.  Bobbit Decl. ¶ 18; Marzan Dep. Tr. at 62:15–64:6.  The Court cannot resolve these contested issues of fact on summary judgment, and doing so is essential to the determination of whether the application of DOCCS's policy denied Plaintiff a reasonable accommodation

### 3.  Injury

Defendants argue that Plaintiff has not produced evidence showing that she was injured as a result of any failure by DOCCS to accommodate her, because she did not suffer a seizure or otherwise require medical attention.  Def. Mem. at 24–25.  But Plaintiff testified that not being able to take her medication led to her feeling lightheaded and nauseous, and to her legs starting to twitch, and that the symptoms were alleviated only when she returned home and took her Lamotrigine.  Bobbit Decl. ¶ 43; Bobbit Dep. Tr. at 118:8–14.  A jury could credit her testimony, as a person who has lived with epilepsy and sciatic pain and relied on her medications for a long time, that these symptoms were a result of her not being permitted to take her medicine.

### 4.  Animus

Deciding whether Marzan, Hann, or Conforti acted with discriminatory animus or ill will towards Plaintiff as a result of her disability requires a determination, first and foremost, on the question of whether Plaintiff made them aware of that disability.  Moreover, Plaintiff testified that Hann made mocking statements indicating that she was not accommodating Plaintiff because she did not think Plaintiff's epilepsy was a serious matter.  Bobbit Decl. ¶ 23, 36; Bobbit Dep. Tr. at 70:9–16.  Hann denies doing so.  Hann Dep. Tr. at 98:13–99:4.  Plaintiff can demonstrate the ill will or animus required for a damages claim by showing that Hann failed to

accommodate her because of a stereotypical belief that a person who says she has epilepsy is likely lying, malingering, or exaggerating the seriousness of the disease. *Cf. Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (holding that animus can be established by showing that a decisionmaker acted based on "assumptions or attitudes regarding the abilities of persons with epilepsy as a class").

In sum, material issues of fact preclude summary judgment for Plaintiff or Defendants on Plaintiff's claim against DOCCS.

D. Claim Against the NYSP

Plaintiff's claims against the NYSP, however, cannot prevail. By the time NYSP officers were involved in this case, Plaintiff was under criminal investigation. There are two main scenarios in which an arrest made by an officer of a covered agency can violate § 504 of the Rehabilitation Act or Title II of the ADA. First, failure to take account of a person's disability can result in "wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity." *Williams v. City of New York*, 121 F. Supp. 3d 354, 369 (S.D.N.Y. 2015) (citations omitted). Second, even where an arrest is appropriate, officers may fail to provide "reasonable accommodation, where . . . they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.*

Defendants admit that Plaintiff described the pills and liquid to Daley as seizure medication that she intended to take, Pl. 56.1 Stmt. ¶ 23, and state that Paolicelli has no memory of Plaintiff asking to take her medication, or describing the medication as a seizure pill, as Plaintiff claims she did. *Id.* ¶ 24. But even accepting as true that Plaintiff made those statements, it would not have been reasonable for Daley or Paolicelli to allow Plaintiff to

consume the medication that had been seized as contraband, and which was evidence of an alleged crime committed by Plaintiff.  "An accommodation is not reasonable if it would impose an undue hardship on a program's operation or would fundamentally alter the nature of the service, program, or activity."  *McElwee*, 700 F.3d at 641 (internal quotation marks and citation omitted).  In this case, it would have been impossible for the NYSP to perform its function— investigating and responding to crime—if its officers permitted Plaintiff to consume evidence of the crime for which she had been arrested.  And Plaintiff has proposed no other reasonable accommodation that she should have been offered.

Accordingly, Plaintiff's motion for summary judgment on her ADA and Rehabilitation Act Claims is DENIED.  Defendants motion is GRANTED as to the claims against the NYSP, but DENIED as to the claims against DOCCS.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiff is entitled to summary judgment on her Fourth Amendment claim against Daley and Paolicelli arising out of Paolicelli's search of Plaintiff's body.

Defendants' motion for summary judgment is also GRANTED in part and DENIED in part.  Defendants are entitled to summary judgment on (1) Plaintiff's claim that evidence fabricated by Marzan caused her arrest and associated deprivations of liberty, and Plaintiff's supervisory liability claims against Hann, Conforti, and Rabideau and failure to intervene claims against Hann, Conforti, Rabideau, Travis, and Wong; (2) Plaintiff's claims against Daley, Hann, and Conforti for supervisory liability and failure to intervene in connection with Murtha's frisk of Plaintiff; (3) Plaintiff's claims against Gagliardi, Campos, Walther, Bohlin, and Marzan

related to the search of Plaintiff's body; and (4) Plaintiff's ADA and Rehabilitation Act claims against the NYSP.

The following claims remain for trial:

1. Plaintiff's claim against Marzan for fabrication of evidence, with respect to deprivations of liberty related to Plaintiff's prosecution;
2. Plaintiff's claims against Murtha arising out of Murtha's frisk of Plaintiff; and
3. Plaintiff's claims against DOCCS for violating the ADA and the Rehabilitation Act.

Trial will commence on **May 17, 2021**.

The Clerk of Court is directed to terminate the motions at ECF Nos. 208 and 209.

SO ORDERED.

Dated:  September 21, 2020
        New York, New York

ANALISA TORRES
United States District Judge